UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

JOHN ANDREW LLEWELLY WILSON,

                    Plaintiff,

v.

CAROLYN W. COLVIN,

                    Defendant.

DECISION & ORDER
15-CV-6316

## Preliminary Statement

Plaintiff John Wilson (hereinafter "plaintiff") brings this action pursuant to Titles II and XVI of the Social Security Act, seeking review of the final decision of the Commissioner of Social Security ("the Commissioner") denying his application for social security disability insurance and supplemental security income. See Docket # 1.  Presently before the Court are the parties' competing motions for judgment on the pleadings.  See Docket ## 10, 13.

## Background and Procedural History

On March 14, 2012, plaintiff applied for social security disability insurance and supplemental security income, alleging a disability onset date of April 1, 2007.  Administrative Record ("AR") at 118-30.  On April 27, 2012, the Social Security Administration denied his application.  AR at 56-59.  Plaintiff

filed a timely request for a hearing before an administrative law judge ("ALJ"). AR at 64-65. On December 18, 2013, ALJ Mary Withum held a hearing on plaintiff's claim. AR at 27-52. On January 23, 2014, the ALJ issued a decision finding plaintiff not disabled under the Social Security Act and denying his application for benefits. AR at 12-23. Plaintiff filed a request for review of the ALJ's decision by the Appeals Council and, on March 27, 2015, the Appeals Council denied his request, making the ALJ's decision the final decision of the Commissioner. AR at 1-7. This federal lawsuit followed.

## Relevant Evidence and Medical History

In plaintiff's disability report, he alleges that he was limited in his ability to work due to his autism, Asperger's syndrome, anxiety disorder, acid reflux, high blood pressure, and panic attacks. AR at 156. Due to the nature of plaintiff's impairments, the record below contains reports from plaintiff's time in high school that pre-date his alleged April 2007 disability onset date.

Educational and Vocational Records: On March 9, 2004, plaintiff underwent a psychological evaluation in accordance with New York regulations for students receiving special education services. AR at 229. According to the report on the evaluation, plaintiff, who was sixteen years old at the time, split his time between a vocational

2

school and a public school.  Id.   In school, he had difficulty
finishing assignments and was disruptive.  Id.   Though he performed
well academically, his behavior suggested that he would need a
significant amount of adult support.  AR at 230.  He had limited but
improving social skills and, according to the report, would benefit
from consulting with a job coach.  Id.

On October 20, 2005, the Committee on Special Education in the
Pittsford Central School District convened to review plaintiff's
Individualized Education Plan.  AR at 223-28.  The report indicates
that plaintiff received special testing accommodations and
organizational support fives time per week.  AR at 224.  The report
also notes that plaintiff displayed symptoms related to Asperger's
syndrome, including issues with self-motivation, independence, work
ethic, and social awareness.  AR at 225.  Nevertheless, he was
knowledgeable, creative, and good-natured, and displayed good
memory, strong reading and math skills, and good verbal and reasoning
skills.  Id.  According to the report, he needed assistance staying
on task, organizing and managing his time, and working independently.
Id.  Additionally, while his social skills were improving, the
report states that plaintiff needed encouragement to socialize with
his peers and remain focused.  AR at 226.

Prior to his high school graduation and after consulting with
the Office of Vocational and Educational Services for Individuals

3

with Disabilities ("VESID"), VESID referred plaintiff to a clinical
neuropsychologist for an evaluation in April 2006.  AR at 232-43.
The report on the evaluation notes that plaintiff worked part-time
tending to the parking lot at Wegmans, a regional supermarket, and
that he was planning on enrolling at Monroe Community College in the
fall of 2006.  AR at 232.  It also notes that he was diagnosed with
attention deficit disorder and Asperger's syndrome at an early age.
Id.  The report indicates that plaintiff's anxiety disrupted his
ability to stay on task, and that he had deficient social skills.
AR at 232-33.  During the examination, plaintiff appeared anxious
but cooperative.  AR at 233.  He displayed an IQ in the "high average
range" with equivalent vocabulary and nonverbal reasoning skills.
AR at 234.  His numerical and written expressive language skills,
however, were at the lower end of the average range and his
socialization was described as moderately low.  Id.  In short,
according to the report, plaintiff's condition appeared consistent
with a diagnosis of Asperger's syndrome and attention deficit
disorder.  Id.  In light of the evaluation, the neuropsychologist
suggested that plaintiff continue to take his medication and receive
special accommodations to complete high school.  AR at 235.

Plaintiff returned to VESID on June 2, 2010 for vocational
training.  AR at 306.  Plaintiff was described as having Asperger's
syndrome, attention deficit disorder, and anxiety.  Id.  He bored

4

easily and had difficulty socializing.  Id.  At the appointment, he appeared engaged and maintained eye contact, but had "no idea" what he would like to do professionally.  AR at 307.

On August 1, 2010, plaintiff met with a vocational rehabilitation counselor through VESID.  AR at 304-05.  The counselor remarked that, due to his impairments, plaintiff had difficulty with job interviews, following written and oral directions, learning new skills, and understanding language subtleties.  AR at 304.  He also had difficulty expressing himself in writing and explaining information coherently.  Id.  Plaintiff's counselor noted that he met the "Most Significantly Disabled" criteria and would benefit from vocational services.  AR at 305.

On September 1, 2010, plaintiff returned to VESID and reported that he had almost graduated from Monroe Community College.  AR at 303.  On April 19, 2011, plaintiff met with another counselor through VESID and reported that he had begun studying culinary arts at Monroe Community College.  AR at 300.  Though he claimed that his impairments impacted his everyday life, he expressed an interest in obtaining employment beyond his job at Wegmans.  Id.  However, issues with organizational skills, anxiety, and anxiety-related gastrointestinal illness presented challenges for him.  Id.

Treatment with Dr. Marsocci: On November 2, 2010, plaintiff saw Dr. Steven Marsocci, M.D., at Elmwood Pediatric Group.  AR at 247-48.

5

He reported feeling anxious, particularly at work, and having difficulty focusing. AR at 247. Plaintiff appeared physically and psychologically healthy, and Dr. Marsocci advised him to contact his psychiatrist. AR at 247-48. Plaintiff returned to Dr. Marsocci on November 16, 2010, and reported that he was feeling better. AR at 249. Though he appeared healthy, Dr. Marsocci advised him again to contact his psychiatrist. Id.

Treatment with Dr. Campbell: On April 22, 2011, plaintiff went to the University of Rochester Medical Center to establish care and receive a physical. AR at 261. The physician, Dr. Scott Campbell, M.D., described plaintiff as morbidly obese and suffering from anxiety with depressive disorder as well as high-functioning Asperger's syndrome. AR at 263. Plaintiff returned to Dr. Campbell on July 26, 2011, and reported high anxiety related to his job search. AR at 269. By January 12, 2012, however, Dr. Campbell observed that plaintiff's anxiety had improved. AR at 270.

Treatment with Dr. Fauth: On March 29, 2011, Dr. Richard Fauth, Ph.D., produced a "Brief Treatment Summary" based on his history with plaintiff. AR at 257. In this summary, Dr. Fauth noted that he saw plaintiff for bi-monthly psychotherapy for approximately two years. Id. Plaintiff reported a lack of career direction, significant anxiety, isolation, dissatisfaction with his weight, and lack of motivation. Id. Dr. Fauth indicated that plaintiff's mental focus

6

had improved through treatment, but that his progress had been moderate. AR at 258. Additionally, while he noted that plaintiff was intelligent and capable, Dr. Fauth remarked that plaintiff rarely took advantage of the strategies they had developed to address his issues. Id. Dr. Fauth noted that plaintiff was frequently derailed by intrusive and distracting thoughts. Id. Despite these issues, Dr. Fauth described plaintiff as kind, friendly, and relatable when comfortable, and noted that plaintiff had successfully completed his courses at Monroe Community College. Id. Dr. Fauth recommended that plaintiff continue to attend counseling to manage his social anxiety and Asperger's-related symptoms, continue taking his medication, and explore different career options. Id. Specifically, Dr. Fauth remarked that plaintiff would perform best in a structured work setting with few people or with well-defined interactions with other individuals. Id.

On March 30, 2012, Dr. Fauth completed a medical source statement for plaintiff at the request of the Division of Disability Determinations. AR at 322-28. Dr. Fauth reported bi-monthly meetings with plaintiff for his Asperger's syndrome, attention deficit disorder, and anxiety disorder that started on April 28, 2010, and described plaintiff's symptoms as: significant social anxiety, below average social skills, significant planning and organizational difficulties, challenges with sustained

7

concentration, and rapid fatigue.  AR at 322.  Dr. Fauth opined that
plaintiff would be limited in his ability to maintain concentration,
interact closely with others, and adapt to environmental changes
without taking a break.  AR at 327.  Dr. Fauth also noted that
plaintiff's communication skills were excellent when he was
comfortable and that he was intelligent, lucid, and thoughtful.  AR
at 325.  Dr. Fauth remarked that plaintiff managed all activities
of daily living well.  AR at 326.  According to Dr. Fauth, plaintiff
brought many assets to the work setting – he was intelligent, verbally
adept, and eager to please – but required frequent breaks due to
social anxiety and rapid-onset fatigue.  Id.  Based on his medical
findings, Dr. Fauth opined that plaintiff was capable of performing
many job functions in a wide array of work settings as long as he
received proper training and was limited to working for four to five
hours per day.  Id.

Treatment with Dr. Thomassen: Plaintiff also received treatment
from Dr. John Thomassen, Ph.D., a clinical psychologist at Easter
Seals New York Diagnostic & Treatment Center.  AR at 321.
Plaintiff's treatment notes with Dr. Thomassen begin on April 24,
2012 and indicate that plaintiff was referred to him by Dr. Fauth.[1]
AR at 321.  Plaintiff expressed an interest in living alone and

---

[1] Based on other evidence in the record, plaintiff started receiving
treatment at Easter Seals as early as fall of 2011.  See AR at 270,
274.

8

obtaining new employment.   Id.   On May 11, 2012, Dr. Thomassen prepared a psychiatric progress note and treatment plan review for plaintiff.   AR at 318.   Dr. Thomassen noted that plaintiff had recently started a new job washing dishes at a restaurant in addition to his position at Wegmans, but that his anxiety had become worse. AR at 318.   Dr. Thomassen also noted that a new medication had helped curb some of plaintiff's anxiety overall.   Id.   However, Dr. Thomassen reported that anxiety held "a great influence over his choices and ability to function."   AR at 319.   According to the record, plaintiff then saw Dr. Thomassen five times, with the last treatment notes dated July 18, 2012.   AR at 313-17.   At these appointments, Dr. Thomassen noted that plaintiff had difficulty maintaining focus for eight hours, difficulty maintaining pace at work, and suffered from generalized anxiety.   Id.

On November 6, 2013, Arthur Broadhurst, a nurse practitioner at Easter Seals, completed an additional psychiatric progress note and treatment plan review for plaintiff.   AR at 332-33.   Broadhurst noted that plaintiff continued to work as a dish washer and that, while his anxiety had decreased, plaintiff was feeling anxious about his application for social security benefits.   AR at 332. Broadhurst also noted that plaintiff's difficulty socializing persisted and that he had lower functional abilities.   AR at 332-33. On evaluation, Broadhurst remarked that plaintiff had a "high level

9

of anxiety" that appeared largely untreatable with medication.   AR
at 333.   Plaintiff did, however, appear interested in learning to
control and cope with his impairments.   Id.   Broadhurst advised
plaintiff to alter his medication and return in two months.   Id.

     The record also contains a "Psychological, Intellectual, and
Adaptive Functioning Assessment" prepared by Dr. Thomassen after
meeting with plaintiff on seven occasions between April and December
2012.   AR at 334.   The report details plaintiff's background,
indicating that he received a degree from Monroe Community College
after six years.   Id.   At the time of this report, which is undated
but was presumably prepared on or after plaintiff's December 2012
appointment with Dr. Thomassen, plaintiff reported feeling sad,
withdrawn, and anxious.   AR at 334-35.   The anxiety, he told Dr.
Thomassen, usually set in after working for thirty minutes to two
hours and made it difficult for him to focus.   AR at 335.
Plaintiff's mother, who also spoke to Dr. Thomassen, confirmed that
plaintiff had difficultly focusing and socializing.   AR at 335-36.

     Based on a review of plaintiff's records, Dr. Thomassen wrote
that plaintiff had a history of Asperger's syndrome and attention
deficit disorder, which contributed to his reported lack of
direction, anxiety, social isolation, and general dissatisfaction.
AR at 337.   Dr. Thomassen also administered the Wechsler Adult
Intelligence   Scale-Fourth   Edition   to   assess   plaintiff's

intellectual functioning.  AR at 338.  The results were varied:
plaintiff scored in the superior range in his ability to process
information and work with language, low average in his working
memory, and above average in intellectual functioning.  Id.  In a
different assessment, plaintiff demonstrated proficiency with
reading and spelling, but difficulty with mathematics.  AR at
338-39.  Dr. Thomassen then noted that, based on plaintiff's results
from the different intellectual and social functioning examinations,
he scored at the fiftieth percentile on the Asperger's Disorder
Quotient, meaning that he had more significant symptoms than fifty
percent of individuals diagnosed with the disorder.  AR at 339.
Based on his review of the record and the test results, Dr. Thomassen
diagnosed plaintiff with Asperger's syndrome; attention-deficit
hyperactivity disorder, inattentive type; generalized anxiety
disorder; and mathematics disorder.  AR at 341.

     Dr. Thomassen opined that plaintiff, due to his impairments,
had lifelong difficulties in social relationships.  AR at 341.  He
often engaged in "isolated pursuits" and had extremely limited
peer-to-peer interactions.  Id.  Relatedly, Dr. Thomassen remarked
that plaintiff had significant anxiety that restricted his ability
to socialize and work.  Id.  Given the "complex interplay of
neurodevelopmental disorder[s]" from which plaintiff suffered, Dr.
Thomassen determined that plaintiff had significant difficulties

11

living independently.  Id.  Additionally, Dr. Thomassen found that plaintiff could only work "on a part-time basis in restricted settings in which he has the ability to retreat when overly anxious and that provides minimal social demands due to his social functional limitations and social anxiety."  AR at 342.  These significant difficulties left his prognosis guarded.  Id.

In another mental impairment questionnaire prepared on November 19, 2013, Dr. Thomassen suggested that plaintiff's prognosis was fair, but provided a number of restrictions due to his impairments. AR at 344.  They included moderate restrictions in his ability to remember locations and work-like procedure, understand one-step instructions, make simple work-related decisions, ask simple questions, sustain a routine without supervision, take public transportation, maintain awareness of normal hazards and take precautions, meet basic standards of neatness, and respond appropriately to changes in the work setting.  Id.  Additionally, Dr. Thomassen suggested that plaintiff would have moderately severe restrictions understanding multi-step instructions, maintaining extended concentration and attention, performing activities within a schedule, maintaining regular attendance, being punctual, working in coordination with others without being distracted, completing a normal workday without interruptions from psychologically-based symptoms, performing at a consistent pace, accepting instructions

12

from supervisors, responding to criticism from supervisors, getting along with peers without unduly distracting them or exhibiting behavioral extremes, and maintaining socially appropriate behavior. Id. Taken together, Dr. Thomassen opined that plaintiff's impairments would require him to take more than three days off from work per month. AR at 345.

Consultative Opinion Evidence: On April 11, 2012, consultative psychologist Christine Ransom, Ph.D., performed an adult psychiatric evaluation of plaintiff. AR at 274-77. At the time of the evaluation, plaintiff had received his degree from Monroe Community College and was working four hours per week at Wegmans. AR at 274. He was also receiving psychological treatment for his anxiety and Asperger's syndrome. Id. He told Dr. Ransom that he experienced constant generalized anxiety and difficulty staying on task. AR at 274-75. He claimed that working for extended periods of time without a break induced panic attacks and that he required breaks every hour from work. AR at 275. On examination, Dr. Ransom noted that plaintiff appeared largely normal, but mildly tense. Id. His attention and concentration, immediate and recent memory, and intellectual functioning all appeared intact. AR at 276. He reported that he dressed and cared for himself, but had difficulty making friends. Id. For hobbies, he said that he worked on computers, watched television, and listened to the radio. Id.

13

Based on her examination, Dr. Ransom opined that plaintiff could

> follow and understand simple directions and instructions,
> perform simple tasks independently, maintain attention
> and concentration for simple tasks, maintain a simple
> regular schedule and learn simple new tasks.  He would
> have mild to moderate difficulty performing complex tasks,
> relating adequately with others and appropriately dealing
> with stress due to Asperger's syndrome, currently mild to
> moderate.

Id.  In short, Dr. Ransom noted, the results of plaintiff's
evaluation were consistent with his allegations.  Accordingly, she
diagnosed plaintiff with mild to moderate Asperger's syndrome and
high blood pressure.  AR at 277.  With continued treatment, Dr.
Ransom opined that his prognosis was fair to good.  Id.

On April 23, 2012, psychological consultant Dr. R. Nobel
reviewed plaintiff's record and prepared a "Psychiatric Review
Technique" form.  AR at 278.  Dr. Nobel determined that plaintiff
suffered from attention deficit disorder, generalized anxiety
disorder, and mild to moderate Asperger's syndrome.  AR at 278-87.
Based on a review of plaintiff's record, Dr. Nobel said that plaintiff
would have moderate difficulties in maintaining social functioning,
concentration, persistence, and pace.  AR at 288.

Dr. Nobel also prepared a mental residual functional capacity
("RFC") assessment, determining that plaintiff would be moderately
limited in his ability to carry out detailed instructions, maintain
extended attention and concentration, perform activities within a

14

schedule, maintain regular attendance, be punctual within customary tolerances, and work in coordination with or in proximity to others without being distracted by them.  AR at 292.  Additionally, Dr. Nobel noted that plaintiff would be moderately limited in his ability to complete a normal workday without interruptions from his psychologically-based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods.  AR at 293.  With respect to social interaction, Dr. Nobel found that plaintiff would be markedly limited in his ability to interact appropriately with the general public and moderately limited in his ability to accept instructions, respond to criticism from supervisors, and get along with peers without distracting them or exhibiting behavioral extremes.  AR at 293.  Finally, Dr. Nobel opined that plaintiff would be moderately limited in his ability to respond appropriately to changes in the work setting and his ability to set realistic goals.  Id.  Nevertheless, Dr. Nobel stated that plaintiff had "the ability to perform at least unskilled work" removed from the public.  AR at 295.

## Hearing Testimony

Testimony of Plaintiff:  On December 18, 2013, plaintiff appeared before ALJ Mary Withum with counsel.  AR at 27-52.  Plaintiff's counsel spoke first, describing plaintiff as a younger

15

individual diagnosed with generalized anxiety disorder, attention deficit disorder, a learning disorder, and Asperger's syndrome, which, when taken together, satisfy listing 12.06 or 12.10 under the regulations. AR at 31. Plaintiff then testified, stating that he worked as a dishwasher at a small restaurant for eight hours per week. AR at 32. He explained that he got the job after working with a professional development agency. AR at 43. The agency, Arc of Monroe County, had job coaches that routinely checked on plaintiff's progress. AR at 44. Before working at the restaurant, he worked part-time at Wegmans, collecting shopping carts and tending to the parking lot. AR at 34. His anxiety, he stated, prevented him from working more than twelve hours per week. Id. He also stated that he had a two-year degree that he earned in six years because he was unable to maintain a full-time schedule. AR at 33.

Plaintiff also explained that his anxiety often led to intestinal problems, which prevented him from working full-time. AR at 35. He testified that his episodes of anxiety left him debilitated, and that he had to isolate himself to calm down. Id. Relatedly, he said that because of his attention deficit disorder, he became bored very easily. AR at 38. While medication helped with his concentration, he said that he still needed a fifteen-minute break every three hours while working. AR at 38-39. For hobbies, plaintiff testified that he watched television and played on his

16

computer.  AR at 40.  He lived with his parents but cared for himself
without assistance.  AR at 41.  He claimed to have no close friends
and said that he generally avoided large and new social environments
because he felt uncomfortable around unfamiliar people.  AR at 41,
46.   He  explained  that  changes  in  his  routine  impacted  his
productivity for the entire day.  AR at 48.  He also described some
physical  limitations  -  including  mild  difficulty  squatting  and
walking on hilly terrain - but explained that his impairments were
primarily mental in kind.  AR at 41-43.

     Testimony of the Vocational Expert: Vocational Expert ("VE")
Judy Burnett also testified at the hearing, explaining that plaintiff
had  no  past  relevant  work  experience  because  he  had  only worked
part-time.  AR at 49.  The ALJ then posed a series of hypotheticals
to the VE to determine what available work existed for a person in
plaintiff's  position.    First,  the  ALJ  asked  what  employment
opportunities existed for a person of the same age and with the same
educational and work history as plaintiff who had no exertional
limits, but: was limited to simple, routine, repetitive tasks; and
could only occasionally interact with coworkers, supervisors, and
the general public.  AR at 49.  The VE responded that such a person
could work as a hand packager, a groundskeeper, or a warehouse worker.
AR at 50.  Next, the ALJ asked the VE what employment opportunities
existed for the same individual, but with the added limitation that

17

they could have no interaction with the general public.  Id.   The
VE testified that such a person could still work as a hand packager,
a groundskeeper, or a warehouse worker.   Id.   However, if the
individual had moderate limitations making simple, work-related
decisions – meaning that, for fifteen percent of the time, they would
be off task – the VE testified that the individual would not qualify
for competitive employment.   AR at 51.

### Determining Disability Under the Social Security Act

The Evaluation Process: The Social Security Act provides that
a claimant will be deemed disabled "if he is unable to engage in any
substantial gainful activity by reason of any medically determinable
physical or mental impairment which . . . has lasted or can be
expected to last for a continuous period of not less than twelve
months."   42 U.S.C. § 1382c(a)(3)(A).   The impairments must be "of
such severity that he is not only unable to do his previous work but
cannot, considering his age, education, and work experience, engage
in any other kind of substantial gainful work which exists in the
national economy . . . ."   42 U.S.C. § 1382c(a)(3)(B).

The determination of disability entails a five-step sequential
evaluation process:

> 1.   The Commissioner considers whether the
> claimant is currently engaged in substantial
> gainful activity.

18

> 2. If not, the Commissioner considers whether the claimant has a "severe impairment" which limits his or her mental or physical ability to do basic work activities.
>
> 3. If the claimant has a "severe impairment," the Commissioner must ask whether, based solely on medical evidence, claimant has an impairment listed in Appendix 1 of the regulations. If the claimant has one of these enumerated impairments, the Commissioner will automatically consider him disabled, without considering vocations factors such as age, education, and work experience.
>
> 4. If the impairment is not "listed" in the regulations, the Commissioner then asks whether, despite the claimant's severe impairment, he or she has residual functional capacity to perform his or her past work.
>
> 5. If the claimant is unable to perform his or her past work, the Commissioner then determines whether there is other work which the claimant could perform. The Commissioner bears the burden of proof on this last step, while the claimant has the burden on the first four steps.

Shaw v. Chater, 221 F.3d 126, 132 (2d Cir. 2000); see also 20 C.F.R. §§ 404.1520, 416.920. Plaintiff bears the burden of proving his case at steps one through four. At step five, there is a "limited burden shift to the Commissioner" to "show that there is work in the national economy that the claimant can do." Poupore v. Astrue, 566 F.3d 303, 306 (2d Cir. 2009) (per curiam) (noting that Commissioner "need not provide additional evidence of the claimant's residual functional capacity" at step five); see also 20 C.F.R. § 404.1560(c)(2).

When evaluating the severity of mental impairment, the
reviewing authority must also apply a "special technique" at the
second and third steps of the five-step analysis.  Kohler v. Astrue,
546 F.3d 260, 265 (2d Cir. 2008); see also 20 C.F.R. § 404.1520a(a).
First, the ALJ must determine whether plaintiff has a "medically
determinable mental impairment."  Kohler, 546 F.3d at 265—66; see
also 20 C.F.R. § 404.1520a(b)(1).   If plaintiff has such an
impairment, the ALJ must "rate the degree of functional limitation
resulting from the impairment(s)" in four broad functional areas:
"(1) activities of daily living; (2) social functioning; (3)
concentration, persistence, or pace; and (4) episodes of
decompensation."  Kohler, 546 F.3d at 266; see also 20 C.F.R. §
404.1520a(c)(3).  "[I]f the degree of limitation in each of the first
three areas is rated 'mild' or better, and no episodes of
decompensation are identified, then the reviewing authority
generally will conclude that the claimant's mental impairment is not
'severe' and will deny benefits."  Kohler, 546 F.3d at 266; see also
20 C.F.R. § 404.1520a(d)(1).  If plaintiff's mental impairment is
considered severe, the ALJ "will first compare the relevant medical
findings and the functional limitation ratings to the criteria of
listed mental disorders in order to determine whether the impairment
meets or is equivalent in severity to any listed mental disorder."
Kohler, 546 F.3d at 266; see also 20 C.F.R. § 404.1520a(d)(2).  If

20

plaintiff's mental impairment meets any listed mental disorder, plaintiff "will be found to be disabled." Kohler, 546 F.3d at 266. If not, the ALJ will then make a finding as to plaintiff's RFC. Id.; see also 20 C.F.R. § 404.1520a(d)(3).

The ALJ's Decision: On January 23, 2014, the ALJ denied plaintiff benefits and supplemental security income. AR at 12-23. In applying the five-step sequential evaluation, the ALJ first found that plaintiff had not engaged in substantial gainful activity since April 1, 2007, the alleged onset date of his disability. AR at 14. At the second step, the ALJ found that plaintiff had the following severe impairments: anxiety disorder, attention deficit hyperactive disorder, and Asperger's syndrome. Id. At the third step, the ALJ analyzed the medical evidence and found that plaintiff did not have an impairment that met or medically equaled the severity of one of the listed impairments in the regulations and, as a result, proceeded to assign plaintiff an RFC. AR at 15-21. The ALJ concluded that plaintiff had the RFC to perform a full-range of work at all exertional levels, but with the following non-exertional limitations: he should perform simple, routine, and repetitive tasks; he should have a low-stress job that requires only occasional decision-making and changes in the work setting; he should have no interaction with the public; and he should have only occasional interaction with co-workers and supervisors. AR at 17.

21

Accordingly, the ALJ moved to the fourth step, which required asking whether plaintiff had the RFC to perform his past work, notwithstanding his severe impairments. AR at 21. Because plaintiff had no past full-time employment history, the ALJ proceeded to the fifth step, which is comprised of two parts. First, the ALJ assessed plaintiff's job qualifications by considering his physical ability, age, education, and previous work experience. Id. The ALJ next determined whether jobs existed in the national economy that a person having plaintiff's qualifications and RFC could perform. AR at 21-22; see also 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. §§ 404.1520(f), 416.920(f). After assessing plaintiff's job qualifications, the ALJ determined that he could work as a hand packager, groundskeeper, or warehouse worker. AR at 22.

## Standard of Review

The scope of this Court's review of the ALJ's decision denying benefits to plaintiff is limited. It is not the function of the Court to determine de novo whether plaintiff is disabled. Brault v. Soc. Sec. Admin., Comm'r, 683 F.3d 443, 447 (2d Cir. 2012) (per curiam). Rather, so long as a review of the administrative record confirms that "there is substantial evidence supporting the Commissioner's decision," and "the Commissioner applied the correct legal standard," the Commissioner's determination should not be disturbed.

22

Acierno v. Barnhart, 475 F.3d 77, 80—81 (2d Cir.), cert. denied, 551 U.S. 1132 (2007). "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Brault v. Soc. Sec. Admin., Comm'r, 683 F.3d at 447—48 (internal citation and quotation marks omitted). "Even where the administrative record may also adequately support contrary findings on particular issues, the ALJ's factual findings must be given conclusive effect so long as they are supported by substantial evidence." Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010) (per curiam) (internal quotation marks omitted).

This deferential standard of review does not mean, however, that the Court should simply "rubber stamp" the Commissioner's determination. "Even when a claimant is represented by counsel, it is the well-established rule in our circuit that the social security ALJ, unlike a judge in a trial, must on behalf of all claimants affirmatively develop the record in light of the essentially non-adversarial nature of a benefits proceeding." Moran v. Astrue, 569 F.3d 108, 112 (2d Cir. 2009); see also Melville v. Apfel, 198 F.3d 45, 51 (2d Cir. 1999) ("Because a hearing on disability benefits is a nonadversarial proceeding, the ALJ generally has an affirmative obligation to develop the administrative record."). While not every factual conflict in the record need be explicitly reconciled by the

23

ALJ, "crucial factors in any determination must be set forth with sufficient specificity to enable [the reviewing court] to decide whether the determination is supported by substantial evidence." Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984). "To determine whether the findings are supported by substantial evidence, the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." Mongeur v. Heckler, 722 F.2d 1033, 1038 (2d Cir. 1983) (per curiam). Moreover, "[w]here there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles." Johnson v. Bowen, 817 F.2d 983, 986 (2d Cir. 1987).

## Discussion

Plaintiff raises three arguments in his motion,[2] but they can

---

[2] Plaintiff argues that: (1) "the ALJ erred in evaluating the opinion evidence of record," (2) "the ALJ's failure to accord proper weight to the treating source opinions was not harmless error," and (3) "the ALJ erred in formulating hypothetical questions to the vocational expert. See Docket # 10-1 at 19-29. At base, however, plaintiff is objecting to the ALJ's application of the treating physician rule and its result on her subsequent RFC determination. Indeed, plaintiff argues that the ALJ's questions to the VE were improper

be distilled into two related challenges: (1) the ALJ erred in evaluating the opinion evidence from plaintiff's treating physicians and (2) this error was not harmless. See Docket # 10-1 at 19-29. Each will be addressed below.

I. Opinions of Plaintiff's Treating Physicians: First, plaintiff argues that the ALJ failed to provide satisfactory reasons for her decision to apply less than controlling weight to the opinion evidence from two of plaintiff's treating physicians, Dr. Thomassen and Dr. Fauth. Id. at 19-27. With respect to Dr. Thomassen, the ALJ assigned "little probative weight" to his assertion that plaintiff would be unable "to work full-time due to deficits in socializing and his anxiety" because "it is a finding reserved for the Commissioner" and "it is not consistent with Dr. Thomassen's evaluation notes, which do not refer to any positive mental findings and the severe health limitations he asserts serve as the basis for his very restrictive opinion" of plaintiff. AR at 19. Similarly, the ALJ gave "little probative weight" to Dr. Fauth's opinion that plaintiff would be unable to work an eight-hour day because "it is a finding reserved for the Commissioner," "it is not consistent with Dr. Fauth's therapy notes," and plaintiff's "mental focus and ability to remain focused" improved through treatment. AR at 20. Plaintiff contends that these explanations are factually inaccurate and

because the RFC was incorrectly determined. Id. at 27-29.

invalid under Second Circuit law.    See Docket # 10-1 at 21-25.    In

response, the Commissioner argues that the ALJ properly gave portions

of Dr. Thomassen's and Dr. Fauth's opinions "less than probative

weight" because they are inconsistent with the record as a whole,

including their treatment notes and the opinion of plaintiff's

consultative examiner.    Docket # 13-1 at 22-27.    Additionally, the

Commissioner notes that the opinions of Dr. Thomassen and Dr. Fauth

treaded into the ALJ's decision-making territory and, thus, were

properly rejected.    Id.

　　There is no question that plaintiff's mental health limitations

are complex.    In determining that plaintiff was not disabled, the

ALJ clearly focused on the fact that plaintiff is relatively healthy,

has   no   exertional   limitations,   and   ranks   above-average   in

intellectual functioning.    But the record also pays tribute to the

fact that the medical professionals who have treated plaintiff and

know him best have found that plaintiff is incapable of maintaining

full-time   competitive   employment   due   to   his   debilitating   and

persistent   mental   impairments.      AR   at   19-21.      Far   from   being

irreconcilable, plaintiff's limitations are remarkably consistent

with his diagnosis of Asperger's syndrome, "a lifelong developmental

disorder characterized by impairment of social interactions and

restricted interests and behaviors."    Neiman v. Astrue, 2011 WL

816779, *1 E.D. Pa. March 8, 2011).      Because the ALJ improperly

26

rejected the critical findings and opinions of plaintiff's treating doctors and then, without adequate explanation, discounted the compelling testimony of plaintiff as "not entirely credible" (AR at 18), the Court finds remand appropriate based on the ALJ's failure to follow the treating physician rule.

Under the treating physician rule, an ALJ must afford "a measure of deference to the medical opinion of a claimant's treating physician." See Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004); 20 C.F.R. § 404.1527(d)(2). Accordingly, the opinion of a claimant's treating physician as to the nature and severity of claimant's impairment is given "controlling weight," so long as it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." Burgess v. Astrue, 537 F.3d 117, 128 (2d Cir. 2008) (citing 20 C.F.R. § 404.1527(d)(2)); see also Green-Younger v. Barnhart, 335 F.3d 99, 106 (2d Cir. 2003); Shaw v. Chater, 221 F.3d 126, 134 (2d Cir. 2000). "Medically acceptable clinical and laboratory diagnostic techniques include consideration of a patient's report of complaints, or history, as an essential diagnostic tool." Burgess, 537 F.3d at 128 (internal citations and quotations omitted).

Relatedly, the Commissioner is required to explain the weight she gives to the opinions of treating physicians. 20 C.F.R. §

404.1527(d)(2) ("[W]e will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion."). This is true even when the treating source's opinion is given controlling weight, but especially true if the opinion is not given controlling weight. See Burgess, 537 F.3d at 129. The ALJ must consider, inter alia, the

> [l]ength of the treatment relationship and the frequency of examination; the nature and extent of the treatment relationship; the relevant evidence, particularly medical signs and laboratory findings, supporting the opinion; the consistency of the opinion with the record as a whole; and whether the physician is a specialist in the area covering the particular medical issues.

Id. (internal quotations omitted) (citing 20 C.F.R. § 404.1527(d)(2)(i)-(ii), (3)-(5)). "After considering the above factors, the ALJ must comprehensively set forth [their] reasons for the weight assigned to a treating physician's opinion." Greek v. Colvin, 802 F.3d 370, 375 (2d Cir. 2015) (citing Burgess, 537 F.3d at 129). The failure to provide "good reasons for not crediting the opinion of a claimant's treating physician is a ground for remand." Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999); see also Schaal v. Apfel, 134 F.3d 496, 505 (2d Cir. 1998) ("Commissioner's failure to provide 'good reasons' for apparently affording no weight to the opinion of plaintiff's treating physician constituted legal error.").

Neither party disputes that Dr. Thomassen and Dr. Fauth were

28

plaintiff's treating physicians.  See Docket # 10-1 at 19-25; see also Docket # 13-1 at 22-27.  Indeed, their treating relationships with plaintiff consisted of recurring appointments that spanned many months, if not several years.  See AR at 257, 321-28, 334-45.  Based on their long-standing relationships with plaintiff, Dr. Thomassen and Dr. Fauth offered a number of opinions about his functional limitations.  For example, Dr. Thomassen opined that plaintiff: would only be capable of working "on a part-time basis in restricted settings in which he has the ability to retreat when overly anxious and that provides minimal social demands due to his social functional limitations and social anxieties"; would have moderate difficulty maintaining a routine without supervision; and would have moderately severe difficulty sustaining extended concentration, maintaining regular   attendance,   completing   a   normal   workday   without interruptions from psychologically-based symptoms, and performing at a consistent pace.  AR at 342-45.  Similarly, Dr. Fauth noted that plaintiff would be limited in his ability to maintain concentration and would only be able to work for four to five hours per day.  AR at 322-27.  The ALJ, however, gave "little probative weight" to these assessments,   claiming   that   they   are   inconsistent   with   their treatment notes and constituted determinations on issues reserved for the ALJ.  AR at 19-20.

    While the Commissioner is correct in arguing that an ALJ may

29

properly discount a treating physician's opinion if it is inconsistent with their treatment notes, see Campbell v. Astrue, No. 12-CV-6103T, 2013 WL 1221931, at *2 (W.D.N.Y. June 29, 2013), that simply isn't the case here.     Nothing in Dr. Thomassen's or Dr. Fauth's notes indicates that their medical source statements were inconsistent or exaggerated.     In fact, from the outset, Dr. Fauth noted that plaintiff had a limited attention span and frequently fell victim to "intrusive thoughts that distract[ed] and preoccupy[ied] him and that sometimes demotivate[d] him."     AR at 257-58.     After treating plaintiff for two years, Dr. Fauth confirmed the persistence of these problems in his functional assessment, noting that plaintiff was only capable of working for four to five hour per day.     AR at 322-27.     Dr. Thomassen's treatment notes similarly indicate that plaintiff had difficulty maintaining focus for eight hours, difficulty keeping pace at work, and that plaintiff suffered from generalized anxiety.     AR at 313-317.     Put simply, I find no support for the ALJ's claim that Dr. Thomassen's and Dr. Fauth's treatment notes betray their ultimate functional assessments.

Regardless, and assuming arguendo that Dr. Thomassen's and Dr. Fauth's notes did not include these specific descriptions of the symptoms of plaintiff's impairments, I fail to see how that would render their functional assessments inconsistent or invalid.     After all, treatment notes are "simply notes from an office visit."     Ubiles

v. Astrue, No. 11-CV-6340T, 2012 WL 2572772, at *9 (W.D.N.Y. July 2, 2012) (relying on treating physician's treatment notes and not their function-by-function assessment violates the treating physician rule). It strikes the Court as particularly "unreasonable to expect a physician to make, on his own accord, the detailed functional assessment demanded by the [Social Security regulations] in support of a patient seeking SSI benefits" in his treatment notes, especially when, as is the case here, the physician intended to compile his findings in a medical source statement. Id. Nevertheless, treatment notes aside, plaintiff's record makes clear at every turn – through his educational and vocational records, his work history, his length of treatment with multiple specialists, his self-reported impairments and limitations, and, of course, his treating physicians' functional assessments – that he suffered from persistent mental impairments that severely impacted his ability to maintain concentration and attendance in a work-related environment.

The ALJ's argument that Dr. Thomassen's and Dr. Fauth's opinion about plaintiff's inability to complete an eight-hour workday is a "finding reserved for the Commissioner" is similarly problematic. AR at 19-20. As the Commissioner correctly notes, see Docket # 13-1 at 26, the ALJ does not need to accept a determination from a treating physician as to the ultimate issue of whether plaintiff is capable of work. Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999). However,

a treating physician's opinion as to the "nature and severity" of
plaintiff's conditions, far from the ultimate issue, is exactly what
a treating physician should be speaking to.  See Green-Younger v.
Barnhart, 335 F.3d 99, 106 (finding that the treating physician was
offering an opinion on the "nature and severity" of plaintiff's
impairment when he discussed her ability to function, sit or stand
continuously and her need for rest periods); see also Rosa v.
Callahan, 168 F.3d 72, 79 (2d Cir. 1999)("[T]he ALJ cannot
arbitrarily substitute his own judgment for competent medical
opinion." (internal citations removed)).  A treating physician's
opinion that their patient is unable to maintain the concentration
and attendance required for an eight-hour work day, for example, is
typically based on objective medical facts developed by the physician
during the course of treatment for an illness or medical issue.
Thus,

> courts have often repeatedly cautioned SSA adjudicators
> that this [ultimate issue] guideline must be considered
> in conjunction with the regulatory mandate that a
> treating source's opinion on the issue of the nature and
> severity of the claimant's impairments must be given
> controlling weight if it is well supported by medically
> acceptable clinical and laboratory diagnostic techniques
> and not inconsistent with other substantial evidence.
> See, e.g., Green-Younger v. Barnhart, 335 F.3d 99, 106
> (2d Cir. 2003).  Indeed, SSR 96-5p expressly reminds
> adjudicators that, "[i]n evaluating the opinions of
> medical sources on issues reserved to the Commissioner,
> the adjudicator must apply the applicable factors in 20
> C.F.R. §§ 404.1527(d) and 416.927(d)." 1996 WL 374183,
> at *3.

Delk v. Astrue, No. 07-CV-167, 2009 WL 656319, at *7 (W.D.N.Y. 2009).
Neither Dr. Thomassen nor Dr. Fauth invented plaintiff's inability
to complete a full work-day; rather, they based their assessments
on their long-standing treating relationships with him.   As this
Court has observed before, the ALJ here appears to be relying on Dr.
Thomassen's and Dr. Fauth's opinions about plaintiff's inability to
work full-time as "talismanic incantation[s] that shielded [her]
from meaningfully engaging" with the various limitations highlighted
by plaintiff's treating physicians.      Rivera v. Colvin, No.
15-CV-6318, 2016 WL 2636311 (W.D.N.Y. May 6, 2016).

     Equally troublesome was the ALJ's boilerplate finding that
plaintiff's "statements concerning the intensity, persistence and
limiting effects of these symptoms are not entirely credible."   AR
at 18.   The plaintiff's testimony about his limitations was entirely
consistent with the findings of his treating doctors.   Given his
Asperger's diagnosis and his lifelong struggles with appropriate
thought process and social interaction, the fact that plaintiff has
repeatedly attempted competitive employment makes his hearing
testimony more, not less credible.   Indeed, there is nothing in the
record to suggest that plaintiff's testimony concerning the
"intensity, persistence and limiting effects symptoms" were anything
but "entirely credible."   Plaintiff is clearly not a malingerer.

33

The anxiety, abnormal social behavior, attention and concentration deficits, difficulties relating to others plaintiff described at his hearing, see AR at 35-36, 38-49, were all well documented in the medical record.   If anything, plaintiff's testimony about his repeated efforts to "fit in" at various workplace environments despite self-awareness of his psychological impairments and limitations, see AR at 45-46, support a finding that he is not exaggerating his symptoms.   Plaintiff's inability to sustain full-time competitive employment is not because he has deliberately exaggerated his "alleged symptoms."

The ALJ also noted that, at some points, the record suggests that plaintiff's condition improved.   Here, however, the fact that plaintiff showed some "improvement" was not so compelling as to override the opinion of plaintiff's treating physicians.   While Dr. Fauth certainly noted that plaintiff made "moderate" progress with therapy, in the same report he stated that plaintiff was "beset by frequent intrusive thoughts" that distracted, preoccupied, and demotivated him.   AR at 258.   More tellingly, a year after commenting on plaintiff's moderate progress, Dr. Fauth asserted that plaintiff was still limited to a maximum of four to five hours of work at a time.   AR at 326.   This revelation – that plaintiff's treating physician found him unable to maintain the requisite concentration and attendance to work more than five hours a day *in*

34

*spite* of his moderate progress – should undermine, not bolster, the ALJ's conclusion.  See Rymer v. Colvin, 62 F. Supp. 3d 265, 271-72 (W.D.N.Y. 2014) (remanding where ALJ gave "slight weight" to treating physician's opinion because claimant's condition improved while being treated after an episode of decompensation).  Similarly, the ALJ's decision to credit the opinion of the consultative examiner over plaintiff's treating physicians is, as best the Court can tell from the record, an arbitrary one.  See Hensley v. Astrue, 573 F.3d 263, 267 (6th Cir. 2009) ("Nothing in the regulations indicates, or even suggests, that the administrative judge may decline to give the treating physician's medical opinion less than controlling weight simply because another physician has reached a contrary conclusion.").  Indeed, the long-term treating relationships plaintiff had with Dr. Thomassen and Dr. Fauth serve as a far more reliable foundation from which to comment on plaintiff's limitations than a single consultative appointment.  While conflicting consultative opinions is just one of two or three reasons[3] the ALJ

---

[3] To reiterate, the ALJ assigned Dr. Thomassen's opinion "little probative weight" because "it is a finding reserved for the Commissioner" and "it is not consistent with Dr. Thomassen's evaluation notes, which do not refer to any positive mental findings and the severe health limitations he asserts serve as the basis for his very restrictive opinion" of plaintiff,  AR at 19, and assigned Dr. Fauth's opinion "little probative weight" because "it is a finding reserved for the Commissioner," "it is not consistent with Dr. Fauth's therapy notes," and plaintiff's "mental focus and ability to remain focused" improved through treatment.  AR at 20.

provides for assigning plaintiff's treating physicians' opinions "little probative weight," a review of the ALJ's decision and the record below makes clear that none of those reasons pass muster. Accordingly, because the Commissioner has not provided "good reasons" that comprehensively explain the weight assigned to plaintiff's treating physicians' opinions, remand is appropriate. See Halloran v. Barnhart, 362 F.3d 28, 33 (2d Cir. 2004) ("We do not hesitate to remand when the Commissioner has not provided "good reasons" for the weight given to a treating physician's opinion and we will continue remanding when we encounter opinions from ALJ's that do not comprehensively set forth reasons for the weight assigned to a treating physician's opinion."); see also see also Schaal v. Apfel, 134 F.3d 496, 505 (2d Cir. 1998) ("Commissioner's failure to provide 'good reasons' for apparently affording no weight to the opinion of plaintiff's treating physician constituted legal error.").

II. The ALJ's RFC Determination: In a continuation of his first argument, plaintiff next asserts that the ALJ's failure to adhere to the Second Circuit's treating physician rule was more than mere harmless error; plaintiff contends that it was prejudicial and necessarily tainted the ALJ's subsequent analysis, especially with respect to her RFC determination.  See Docket # 10-1 at 28-29.

The Court agrees.  By rejecting the functional assessments provided by plaintiff's treating physicians as to his ability to

maintain concentration and attendance in a work setting, the ALJ had no opinion evidence to consider on that issue other than what was provided by: (1) a consultative examiner who saw plaintiff once; and (2) a state agency consultant who never saw plaintiff at all. AR at 19-20. These sorts of opinions are not substitutes for the thorough medical source statements provided by plaintiff's longtime treating physicians. See, e.g., Greek v. Colvin, 802 F.3d 370, 376 (2d Cir. 2015). After all, the Social Security regulations require ALJs to give treating source opinions controlling weight in the vast majority of circumstances for that very reason. See 20 C.F.R. § 404.1527(c) ("Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations."). To make matters worse, the VE here testified that an individual with the functional limitations proposed by Dr. Thomassen could not maintain competitive employment, see AR at 51, meaning that, had the ALJ properly weighed and considered the medical source statement provided by Dr. Thomassen, her conclusion would have been different. Accordingly, the ALJ's violation of the treating physician was not

37

harmless and remand is required.  See Greek, 802 F.3d at 376.

## Conclusion

For the reasons set forth above, the Commissioner's motion for judgment on the pleadings (Docket # 13) is **denied** and plaintiff's motion for judgment on the pleadings (Docket # 10) is **granted** only insofar as remanding this matter back to the Commissioner for further proceedings consistent with the findings made in this Order.

SO ORDERED.

JONATHAN W. FELDMAN
United States Magistrate Judge

Dated: September 27, 2016
       Rochester, New York

38